IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WECO SUPPLY COMPANY, INC., a California corporation )<br><br>Plaintiff, )<br><br>v. )<br><br>THE SHERWIN-WILLIAMS COMPANY, )<br><br>Defendant. )<br>_____ )<br>AND RELATED CROSS-ACTION )<br>_____ ) | 1:10-CV-00171 AWI BAM<br><br>**ORDER ON DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT, OR, IN THE ALTERNATIVE, SUMMARY ADJUDICATION OF ISSUES**<br><br>(Doc. 47) |

**INTRODUCTION**

This is a business dispute between Plaintiff Weco Supply Company, Inc. ("Weco") and Defendant The Sherwin-Williams Company ("Sherwin-Williams"). Weco filed the initial action against Sherwin-Williams in Fresno County Superior Court on December 22, 2009. Sherwin-Williams filed a cross-complaint. On February 2, 2010, Sherwin-Williams removed the action to federal court on the basis of diversity jurisdiction. Sherwin-Williams filed a First Amended Cross-Complaint ("FACC") on August 3, 2010, and Weco filed a First Amended Complaint ("FAC") on September 3, 2010. Sherwin-Williams now moves for summary judgment on the FAC and FACC or, in the alternative, summary adjudication of issues. See Court's Docket, Doc. No. 47. Weco has filed an opposition to the motion, and Sherwin-Williams has filed a reply.

The matter was taken under submission without oral argument.  For the reasons set forth below, Sherwin-Williams' motion is granted in part and denied in part.

**BACKGROUND**[1]

Plaintiff Weco is a California corporation engaged in the business of selling paint and welding supplies.  <u>See</u> AMF No. 1.  Defendant Sherwin-Williams is an Ohio corporation engaged in the business of manufacturing and distributing paint products.  <u>See</u> Notice of Removal; AMF No. 4.  For over thirty years, Weco purchased Sherwin-Williams manufactured paint for resale to its customers.  <u>See</u> AMF No. 4.  In 2002, Weco and Sherwin-Williams entered into a written agreement for the distribution of Sherwin-Williams paint products, referred to as a Direct Jobber Agreement (the "Jobber Agreement").  <u>See</u> UMF No. 1.  The Jobber Agreement states "[Weco] shall exercise its best efforts to market the Products to End Users and to promote the goodwill and market reputation of [Sherwin-Williams] and the Products."  <u>See</u> UMF No.2; FAC, Ex. A ¶ 2c.  Among other things, the Jobber Agreement reserves to Sherwin-Williams the right to "sell Products directly to any jobber and/or any End User in any geographical area including the same geographical area serviced by [Weco]."  <u>See</u> UMF No. 4; FAC, Ex. A ¶ 4b. The Jobber Agreement sets forth the following limitation of remedies clause:

> [Sherwin-Williams] shall in no event be be liable to [Weco] or to any other person

---

[1] "DUMF" refers to the Amended Separate Statement of Undisputed Material Facts and Supporting Evidence in Support of Defendant's Motions for Summary Judgment, or, in the alternative Summary Adjudication of Issues.  <u>See</u> Court's Docket, Doc. No. 50.  "AMF" refers to Weco's Statement of Additional Disputed Material Facts. <u>See id.</u>, Doc. No. 57-1.  "PRDUMF" refers to Weco's Response to Sherwin-Williams' Amended Separate Statement of Undisputed Material Facts.  <u>See id.</u> "DRAMF" refers to Sherwin-Williams' Response to Weco's Additional Disputed Facts.  <u>See id.</u> Doc. No. 60-1.  The Court will note any factual disputes where they exist, and, for purposes of summary judgment, will construe any ambiguities in the light most favorable to Weco, the non-moving party.  <u>See</u> <u>Stegall v. Citadel Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).

The Court notes Weco has filed written objections to the Declarations of Harvey Hill, William Turner, and Robert Latunski filed in support of the motion to dismiss.  <u>See</u> Court's Docket, No. 57-2.  Sherwin-Williams has filed written objections to the Declaration of John Sorensen filed in support of Weco's Opposition.  <u>See</u> Court's Docket, Doc. No. 61.  To the extent the facts set forth in the declarations are disputed, the Court does not rely on them, and therefore makes no rulings on the evidentiary objections, at the summary judgment stage.

2

claiming through [Weco], whether in contract, tort, strict product liability or otherwise, for indirect, special, incidental or consequential damages, loss of profits, demurrage, or penalties arising from any cause whatsoever.

UMF No. 7; FAC, Ex. A ¶ 6b.

Two automotive body shops, Mastercraft and Color Glow, were Weco's key customers. Mastercraft and Color Glow purchased large quantities of Sherwin-Williams' "Western" product line from Weco.  See UMF No. 8; AMF No.15.  In the year preceding January 2007, Weco purchased more "Western" paint from Sherwin-Williams, than other Sherwin-Williams product line.  See DRAMF Nos. 18, 19.  Weco also purchased smaller quantities of the Sherwin-Williams "Ultra" product line[2] to sell to Mastercraft and Color Glow.  AMF No. 19; Sorensen Decl. ¶ 17; DRAMF No. 18, 19.  Sherwin-Williams sold "Western" paint to Weco for 23% off the jobber price, plus an additional 9% off if Weco purchased in bulk.  See UMF No. 32.  Weco, in turn, sold the Sherwin-Williams "Western" paint to Mastercraft and Color Glow at a profit margin of 15% to 18%.  UMF No. 35.  Sherwin-Williams was aware of the prices Weco charged Mastercraft and Color Glow, and, as Weco's supplier, it necessarily knew Weco's paint acquisition costs.  PRUMF No. 29; Sorensen Decl. ¶ 19.  However, Weco undertook efforts to keep its pricing and cost information secret from the general public and its competitors.  PRUMF No. 29; Sorensen Decl. ¶ 19.

From time to time, William Turner, a Sherwin-Williams representative, visited the Mastercraft and Color Glow facilities to provide technical support and sales information.  See UMF No. 49; Turner Decl. ¶¶ 3, 20.  On these visits, Mr. Turner acted as Weco's supplier, not as a direct seller to Mastercraft and Color Glow.  See PRDUMF No. 49; Sorensen Decl.¶ 20.  Weco was aware, however, that from time to time, prior to January 2007, Mastercraft and Color Glow purchased some paint directly from the Sherwin-Williams store located in Fresno.  See Sorensen

---

[2] Weco contends the "Ultra" product line is Sherwin-Williams "top-of-the-line" automotive paint and is much more expensive than the "Western" product line.  See AMF No. 20; Sorensen Decl. ¶ 7.

Depo. 136:21-137:14.

In or about January 2007, Sherwin-Williams announced it was discontinuing the "Western" paint line and intended to replace it with another line of paint. See UMF Nos. 10, 11; Turner Decl. ¶10; PRUMF No. 11; Sorensen Depo. 100:3-13; 112:17-21. Sherwin-Williams contends its purpose in discontinuing the "Western" product line was to introduce a higher quality paint that was more compliant with California's legal limits on volatile organic compounds ("VOCs"). See UMF No. 13; Latunski Decl. ¶ 7. Weco responded to the announcement by placing a large order[3] for "Western" paint from Sherwin-Williams in late January 2007, in order to meet the continued demand of Mastercraft and Color Glow. See AMF Nos. 29, 30. Weco also met with Mastercraft and Color Glow to inform them that the "Western" product line was being discontinued, and to explore substitute paint lines, including alternative Sherwin-Williams paints, to meet their demand once Weco's supply of "Western" paint was exhausted. See AMF No. 31; Sorensen Decl. ¶ 13; DRAMF No. 31.

Sherwin-Williams contends Weco was attempting to sell Mastercraft and Color Glow other manufacturers' products[4] to replace Sherwin-Williams products. See UMF Nos. 16, 17, 19; Desai Depo. 46:7-49:11; Barcellos Depo. 66:16-67:12. Thereafter, Sherwin-Williams offered to sell paint directly[5] to Mastercraft and Color Glow. See UMF Nos. 20, 21; Turner Decl. ¶ 8.

---

[3] As discussed below, this order is the subject of Sherwin-Williams' counterclaims. See UMF No. 43; PRUMF No. 43.

[4] Weco disputes this and maintains that, in or about 2006, it offered paint manufactured by Matrix as an alternative to Sherwin-Williams "Ultra" paint line, but only after Mastercraft and Color Glow asked for a more affordable alternative, and only so that it wouldn't lose Mastercraft and Color Glow's premium paint business. See PRUMF No. 19; Sorensen Depo. 156:11-158:7; Sorensen Decl. ¶¶ 8, 9. Weco contends it neither wanted nor attempted to replace Sherwin-Williams "Western" paint with any other paint. See AMF No. 22; Sorensen Decl. ¶¶ 8, 9.

[5] Sherwin-Williams contends it began selling directly in order to preserve Mastercraft and Color Glow's business because it viewed Weco as a competitor once Weco began offering other manufacturers' products. See UMF No. 21. Latunski Decl. ¶¶ 4, 8; Turner Decl. ¶¶ 7-8. Weco disputes this and argues Sherwin-Williams offered to sell to Mastercraft and Color Glow because it wanted to "get rid" of its jobbers, and Weco, in particular. See PRUMF No. 21; Barcellos

1    Before Color Glow started purchasing directly from Sherwin-Williams, it provided Sherwin-

2    Williams with a copy of Weco's price list[6] for Sherwin-Williams paint.  See UMF No. 28; Desai

3    Depo. 26:21-27:10.  The prices Sherwin-Williams offered to Mastercraft and Color Glow were

4    intended to compete with Weco's offer to sell paint manufactured by Matrix.  See UMF No. 22;

5    Latunski Decl. ¶ 4; Turner Decl. ¶ 8.

6          After Sherwin-Williams made the offer to sell directly to Mastercraft and Color Glow,

7    Color Glow agreed to purchase its paint requirements directly from Sherwin-Williams.  See

8    UMF No. 25; PRUMF No. 25; Desai Depo. 20:16-22:21.  Mastercraft continued to purchase the

9    "Western" line from Weco, but eventually began purchasing directly from Sherwin-Williams for

10   some of its paint needs.  See UMF Nos. 26, 27.   The prices Sherwin-Williams charged

11   Mastercraft and Color Glow for "Western" paint were less than the prices charged by Weco.  See

12   AMF No. 34; DRAMF No. 34.  Weco was forced to sell Mastercraft the remaining "Western"

13   paint from the large January 2007 order at the price Sherwin-Williams had quoted to Mastercraft,

14   which cut into Weco's profit margin and caused it to lose business to its former supplier.  See

15   PRUMF No. 26; Sorensen Depo. 169:6-9; DRAMF No. 55.   Sherwin-Williams maintains the

16   price it offered to Mastercraft and Color Glow preserved a profit margin, and that it earned

17   approximately 4% more than the price sold to Weco.  See UMF No. 34; Turner Decl. ¶ 10.

18   Weco disputes this, citing the increased number of deliveries Sherwin-Williams had to make to

19   sell a month's worth of paint directly to Mastercraft and Color Glow, compared with making one

20   delivery of a truck-load quantity to Weco, as well as increased fuel costs and extra employee

21   time.  See PRDUMF No. 31; Sorensen Decl. ¶ 16.  The owner of Mastercraft has also testified

22   that since 2009, Sherwin-Williams has been raising its prices by 7-10%.  See AMF No. 60;

23   Barcellos Depo. 80:24-81:21.

24         Weco has not paid for the January 2007 order of "Western" paint, totaling $135,083.27.

25   ─────────────────────

26   Depo. 43:11-20.

27          [6] Weco contends Sherwin-Williams already had this information.  See Sorensen Decl.
     ¶19.

28                                              5

See UMF No. 43; PRUMF No. 43.  The unused inventory from that order remains unsold in

Weco's warehouse.  See Sorensen Decl. ¶ 24.  Weco has offered to return the paint to Sherwin-

Williams, but the parties dispute whether the Jobber Agreement obligates Sherwin-Williams to

accept the unused paint.  See AMF Nos. 56, 57; DRAMF No. 56, 57 ; Sorensen Decl. ¶ 24.

**LEGAL STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine

issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Poller v.

Columbia Broadcast System, 368 U.S. 464, 467 (1962);  Southern California Gas Co. v. City of

Santa Ana, 336 F.3d 885, 888 (9th Cir. 2003). The standard that applies to a motion for summary

adjudication of issues is the same as that which applies to a motion for summary judgment. See

Fed.R.Civ.P. 56(a), 56(c); Mora v. ChemTronics, 16 F.Supp.2d. 1192, 1200 (S.D.Cal.1998).

Under summary judgment practice, the moving party:

> [A]lways bears the initial responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any," which it
> believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Miller v. Glenn Miller Productions, Inc., 454

F.3d 975, 987 (9th Cir. 2006).  A fact is material if it could affect the outcome of the suit under

the governing substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

Miller, 454 F.3d at 987.

If the moving party meets its initial responsibility, the burden then shifts to the opposing

party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); First Nat'l Bank of Arizona v. Cities

Serv. Co., 391 U.S. 253, 288-89 (1968); Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Companies,

Inc.,210 F.3d 1099, 1103 (9th Cir. 2000).   The opposing party cannot "'rest upon the mere

allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific

facts showing that there is a genuine issue for trial.'" <u>Estate of Tucker v. Interscope Records</u>, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)); <u>Miller</u>, 454 F.3d at 987. In attempting to establish the existence of this factual dispute, the opposing party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e); <u>Matsushita</u>, 475 U.S. at 586 n.11; <u>First Nat'l Bank</u>, 391 U.S. at 289; <u>Miller</u>, 454 F.3d at 987.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Cline v. Industrial Maintenance Engineering & Contracting Co.</u>, 200 F.3d 1223, 1229 (9th Cir. 2000), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, <u>Anderson</u>, 477 U.S. 248-49; <u>In re Caneva</u>, 550 F.3d 755, 761 (9th Cir. 2008); <u>Lindsey v. SLT Los Angeles, LLC</u>, 447 F.3d 1138, 1144 (9th Cir. 2006).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." <u>First Nat'l Bank</u>, 391 U.S. at 290;  <u>Giles v. General Motors Acceptance Corp.</u>, 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments); <u>International Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401, 1405 (9th Cir. 1985).

In resolving the summary judgment motion, the Court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c); <u>Poller</u>, 368 U.S. at 468; <u>Price v. Sery</u>, 513 F.3d 962, 965 n.1 (9th Cir. 2008); <u>Lockett v. Catalina Channel Exp., Inc.</u>, 496 F.3d 1061, 1064 (9th Cir. 2007).  "[I]n ruling on a motion for summary judgment, the nonmoving party's evidence 'is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" <u>Hunt v. Cromartie</u>, 526 U.S. 541,

552 (1999) (quoting <u>Anderson</u>, 477 U.S. at 255); <u>Miller</u>, 454 F.3d at 987; <u>Stegall v. Citadel</u> <u>Broad, Inc.</u>, 350 F.3d 1061, 1065 (9th Cir. 2003).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  <u>Matsushita</u>, 475 U.S. at 587 (citation omitted).

Additionally, the Court has the discretion in appropriate circumstances to consider materials that are not properly brought to its attention, but the Court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references.  <u>See</u> <u>Southern Cal. Gas Co. v. City of</u> <u>Santa Ana</u>, 336 F.3d 885, 889 (9th Cir. 2003); <u>Carmen v. San Francisco Unified Sch. Dist.</u>, 237 F.3d 1026, 1031 (9th Cir. 2001).

## DISCUSSION

As a preliminary matter, the Jobber Agreement provides that the validity, interpretation, and performance of the contract is governed by Ohio law.  <u>See</u> FAC, Ex. A ¶6e.  The parties do not challenge this provision.  The Court will therefore apply Ohio law to Weco's breach of contract claims, and to Sherwin-Williams' breach of contract counterclaims.  Weco also asserts claims under California's unfair competition, unfair trade practices, and trade secrets laws.

<u>First Amended Complaint</u>

A.      Unfair Business Practices - Cal. Business & Professions Code § 17200 et seq.

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 et seq., provides: "Any person who engages, has engaged, or proposes to engage in unfair competition may be enjoined in any court of competent jurisdiction."  Cal. Bus. & Prof. Code § 17203. Unfair competition includes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising. . ."  <u>Id.</u> § 17200.  The California Supreme

Court has clarified that:

> When a plaintiff who claims to have suffered injury from a direct competitor's "unfair" act or practice invokes section 17200, the word "unfair" in that section means conduct that threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition.

Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co., 20 Cal.4th 163, 187, 973 P.2d 527, 544, 83 Cal .Rptr.2d 548, 565 (Cal. 1999). Under the Cel-Tech test, courts look to the federal antitrust laws to evaluate an unfair competition claim.  Watson Laboratories, Inc. v. Rhone-Poulenc Rorer, Inc., 178 F.Supp.2d 1099, 1119 (C.D.Cal. 2001).  Courts have held that a plaintiff cannot prevail on a claim on UCL claim where the "evidence merely indicates harm to its commercial interests, rather than harm to competition."  Id.  (citing Sun Microsystems, Inc. v. Microsoft Corp., 87 F.Supp.2d 992, 1001 (N.D.Cal.2000)).  "[A]n act is deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and raises the prices of goods above competitive levels or diminishes their quality."  Id. at 1119.

The FAC's First Cause of Action alleges Sherwin-Williams used unlawful and unfair business practices by marketing directly to Weco's customers and using inside information to undercut Weco's pricing structure. Weco argues that although the Jobber Agreement reserved to Sherwin-Williams the right to sell to end users, it did not authorize Sherwin-Williams to compete directly with Weco.  FAC ¶ 15.  Rather, Weco contends the long history between the parties established a supplier/jobber relationship with an implicit understanding that while Sherwin-Williams could sell to a Weco end user in its store, it would not compete directly with Weco in its capacity as a jobber.

Here, although Sherwin-Williams' conduct undoubtedly harmed Weco's commercial interests, a factfinder could not reasonably find that Sherwin-Williams engaged in "unfair competition" under the Cel-Tech test.  Weco presents no evidence tending to show that Sherwin-Williams' conduct raised the price to consumers, harmed allocative efficiency, or diminished the quality of paint sold.  In fact, the prices offered by Sherwin-Williams to Mastercraft and Color

9

Glow were lower than the prices offered by Weco.[11]  Although there is some evidence that, since 2009, Sherwin-Williams has increased the prices it charges to Mastercraft, there is no evidence that these prices are above competitive levels.  Any implied understanding that Sherwin-Williams could sell to end users in its stores, but not directly, is irrelevant to Weco's UCL claims.  "It is well-established that a manufacturer or producer has the right to deal with whom he pleases and to select his customers at will, so long as there is no resultant effect which is violative of antitrust laws."  Ricchetti v. Meister Brau, Inc., 431 F.2d 1211, 1214 (9th Cir. 1970).  Sherwin-Williams' conduct may have been "unfair" in the colloquial sense of the word, but the Court finds no genuine issue of material fact as to whether it was "unfair" within the meaning of the UCL.  The Court therefore grants summary judgment on the First Cause of Action.


   B.  Unfair Practices - Cal. Business & Professions Code § 17000 et seq.

  The California Unfair Practices Act prohibits "unfair, dishonest, deceptive, destructive, fraudulent and discriminatory practices by which fair competition is destroyed or prevented." Cal. Bus. & Prof. Code § 17001.  Under the Unfair Practices Act,

> The secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition, is unlawful.

Id. § 17045.  Weco alleges Sherwin-Williams provided Mastercraft and Color Glow with unearned discounts and sales on terms and conditions different from those offered to Weco, with the intent to injure Weco's business.  FAC ¶¶ 20-23.

---

[11]  Further, Sherwin-Williams maintains it increased its profit margin by selling directly because the prices it charged to end users were greater than the prices it charged to Weco. Sherwin-Williams offers evidence that the packaging of the product remained the same, and there were no increased delivery costs because Mastercraft and Color Glow were added to an existing delivery route.  As discussed above, Weco argues Sherwin-Williams necessarily incurred higher costs due to an increased number of deliveries and the attendant increases in fuel and labor costs.  However, there is no evidence that these costs would have been greater than the price Sherwin-Williams charged to Mastercraft and Color Glow.

1   Sherwin-Williams contends the Unfair Practices Act does not prohibit offering a discount

2   to meet competing offers from other distributors.  Courts have held that a defendant does not

3   violate § 17045 where competition was not injured by the defendant's conduct.  See E&H

4   Wholesale v. Glaser Bros., 158 Cal. App. 3d 728, 738-39 (Cal. App. 1984); Design and Office

5   Concepts, Inc. v. Haworth, Inc., 1996 WL 617308, 4 (N.D.Cal.) (N.D.Cal. 1996) (citing Diesel

6   Electric Sales & Service, Inc. v. Marco Marine San Diego, Inc., 20 Cal.Rptr.2d 62 (Cal.App.

7   1993).  Although Weco contends Sherwin-Williams attempted to put it out of business by selling

8   directly to Mastercraft and Color Glow, it is undisputed that Weco continued to compete with

9   Sherwin-Williams by introducing and selling other manufacturers' paint.  As discussed above,

10  Weco has failed to allege facts tending to show harm to overall competition as a result of

11  Sherwin-Williams' actions.  Accordingly, the Court grants summary judgment on the Second

12  Cause of Action.

13      C.      Misappropriation of Trade Secrets

14      Weco alleges Sherwin-Williams misappropriated trade secrets in violation of the Uniform

15  Trade Secrets Act, Cal. Civ. Code § 3426 et seq.  To prove misappropriation of trade secrets, a

16  plaintiff must show:

17

18      (1) the existence of subject matter which is capable of protection as a trade secret; (2) the
        secret was disclosed to the defendant, ... under circumstances giving rise to a contractual
19      or other legally imposed obligation on the part of the disclosee not to use or disclose the
        secret to the detriment of the discloser; and (3) if the defendant is an employee or former
20      employee of the plaintiff ... the facts alleged must also show that the public policy in
        favor of the protection of the complainant's interest in maintaining the secret outweighs
21      the interest of the employee in using his knowledge to support himself in other
        employment.

22

23  Globespan, Inc. v. O'Neill, 151 F.Supp.2d 1229, 1235 (C.D.Cal. 2001) (quoting Cal Francisco

24  Inv. Corp. v. Vrionis, 14 Cal.App.3d 318, 321-22, 92 Cal.Rptr. 201 (1971)).  California Civil

25  Code § 3426.1(d) defines a trade secret as information that:

26      (1) Derives independent economic value, actual or potential, from not being generally
        known to the public or to other persons who can obtain economic value from its

27

28                                              11

disclosure or use; and

(2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d).

"To find misappropriation, California courts require that the trade secret be used by the Defendant or disclosed by the Defendant to a third party." Globespan, 151 F.Supp.2d at 1235 (citing Cal. Civil Code § 3426.1(b); Cal Francisco Inv. Corp., 14 Cal.App.3d at 321, 92 Cal.Rptr. 201). California Civil Code § 3426.1(b) defines misappropriation as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(A) Used improper means to acquire knowledge of the trade secret; or

(B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(i) Derived from or through a person who had utilized improper means to acquire it;

(ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b).

Weco alleges the trade secrets at issue are its pricing to end users and cost of acquisition. Although a trade secret must not be generally known to the public or to competitors, a trade secret may be disclosed to others if they are obligated to keep that information secret.  See In re

1  Providian Credit Card Cases, 96 Cal. App. 4th 292, 304 (Cal. App. 2002).  Weco does not

2  dispute that its cost of purchasing Sherwin-Williams paint and its pricing to end users was known

3  to Sherwin-Williams as its supplier.  Rather, Weco contends Sherwin-Williams was obligated to

4  preserve the confidentiality of that information due to its longstanding supplier/jobber

5  relationship and mutual understanding with Weco.  However, Weco provides no evidence of this

6  understanding, aside from its own declaration stating that Sherwin-Williams had never before

7  marketed directly to Weco's customers, and their business relationship was "more like a

8  partnership than anything."  See Sorensen Decl. ¶ 20.  This is insufficient to establish a duty of

9  confidentiality.  See F.T.C. v. Publ'g Clearing House, Inc., 104 F.3d 1168, 1171 (9th Cir.1997)

10  ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is

11  insufficient to create a genuine issue of material fact.").  Moreover, Weco cites no legal authority,

12  and the Court can find none, for the proposition that a supplier/jobber relationship independently

13  gives rise to a confidential relationship for the purposes of a trade secrets claim.  The undisputed

14  facts show that Weco's pricing to end users and costs of acquisition were not trade secrets within

15  the meaning of the Uniform Trade Secrets Act.  The Court therefore grants summary judgment

16  on the Fourth Cause of Action in favor of Sherwin-Williams.

17       D.     Intentional Interference with Prospective Economic Advantage

18            Under California law, in order to prevail on a claim for intentional interference with

19  prospective economic advantage, a plaintiff must prove the following elements:

20       (1) an economic relationship between the plaintiff and some third party, with the
     probability of future economic benefit to the plaintiff; (2) the defendant's knowledge of
21       the relationship; (3) intentional acts on the part of the defendant designed to disrupt the
     relationship; (4) actual disruption of the relationship; and (5) economic harm to the
22       plaintiff proximately caused by the acts of the defendant

23  Korea Supply Co. v. Lockheed Martin Corp., 29 Cal.4th 1134, 1153 (Cal. 2003) (quoting

24  Westside Center Associates v. Safeway Stores 23, Inc., 42 Cal.App.4th 507, 521-522, 49

25  Cal.Rptr.2d 793 (Cal. App. 1996)).  Further, the plaintiff must show that the defendant "engaged

26  in conduct that was wrongful by some legal measure other than the fact of interference itself.

27

28                                          13

1   <u>Della Penna v. Toyota Motor Sales, U.S.A., Inc.</u>, 11 Cal.4th 376, 393, 902 P.2d 740, 751, 45

2   Cal.Rptr.2d 436, 447 (Cal. 1995).  An act is "independently wrongful" only if it is "unlawful,"

3   meaning it is "proscribed by some constitutional, statutory, regulatory, common law, or other

4   determinable legal standard."  <u>Korea Supply</u>, 29 Cal. 4th at 1159.

5       Weco argues Sherwin-Williams engaged in unfair competition by using intentional and

6   improper methods of taking business from Weco.  However, because Weco's claim relies on a

7   violation of the California UCL, Unfair Practices Act, or Uniform Trade Secrets Act, there is no

8   basis for an independently wrongful act.  Accordingly, the Court will grant summary judgment as

9   to the Third Cause of Action.

10      E.      Breach of Contract

11      Weco contends Sherwin-Williams breached the Jobber Agreement by announcing it

12  would discontinue the "Western" line of paint, and by refusing to repurchase or accept the return

13  of Weco's unused product.  Under Ohio law:

14      To succeed on a breach-of-contract claim, all of the following elements must be proven:
        (1) that a binding contract or agreement exists, (2) that the asserting party performed their
15      contractual obligations, (3) that the party against whom the claim is asserted failed to
        fulfill its contractual obligations without legal excuse, and (4) that the asserting party
16      suffered damages as a result.

17  <u>Ireton v. JTD Realty Invests., L.L.C.</u>, 162 Ohio Misc.2d 1, 16, 944 N.E.2d 1238, 1250 (Ohio

18  Com. Pl. 2010) (citing <u>Garofalo v. Chicago Title Ins. Co.</u>, 104 Ohio App.3d 95, 108, 661 N.E.2d

19  218 (1995)).  "Ohio has applied the rule that 'contracts must be given a just and reasonable

20  construction in order to carry out the presumed intent of the parties.'" <u>Butler-Peak v.</u>

21  <u>Cunningham</u>, 138 Ohio App.3d 334, 340, 741 N.E.2d 219, 223 (Ohio App. 2000) (quoting <u>E.S.</u>

22  <u>Preston Associates, Inc. v. Preston,</u>, 24 Ohio St.3d 7, 10, 492 N.E.2d 441, 444-445 (Ohio 1986)).

23      The parties do not dispute that the Jobber Agreement is a binding contract.  Rather,

24  Sherwin-Williams contends Weco breached its contractual obligation to use best efforts to

25  market Sherwin-Williams paint by marketing another manufacturer's paint to Mastercraft and

26  Color Glow.  The Jobber Agreement provides that "[Weco] shall exercise its best efforts to

27

28                                      14

1   market the Products to End Users and to promote the goodwill and market reputation of

2   [Sherwin-Williams] and the Products."  See FAC, Ex. A, ¶ 2c.  Weco contends it exercised "best

3   efforts" after Sherwin-Williams announced it would discontinue the "Western" product line by

4   purchasing as much "Western" paint as possible in order to continue marketing as much

5   Sherwin-Williams paint as it could.  The Jobber Agreement is ambiguous as to what constitutes

6   "best efforts " in Paragraph 2c.  Although contract interpretation is generally a question of law,

7   where a contract is ambiguous the parties' intent is a question of fact.  See Crane Hollow, Inc. v.

8   Marathon Ashland Pipe Line, LLC, 138 Ohio App.3d 57, 74, 740 N.E.2d 328 (Ohio App. 2000);

9   U.S. Fid. & Guar. v. Aultman St. Elizabeth Med. Ctr., 129 Ohio App.3d 45, 55, 716 N.E.2d 1201

10  (Ohio App. 1999).  The Court finds there is a genuine issue of material fact as to the parties'

11  intent in Paragraph 2c of the Jobber Agreement.

12        The Jobber Agreement states that "[Sherwin-Williams] hereby appoints [Weco] as a non-

13  exclusive jobber of these automotive refinish products that are specifically designated on Exhibit

14  A, which is attached hereto and incorporated by reference (collectively referred to herein as the

15  'Products')."  See FAC, Ex. A., ¶ 1a.  Exhibit A to the Jobber Agreement lists "Sherwin-

16  Williams Products" and "Western Products," with checkmarks placed next to certain products in

17  each category.  See id., Ex. A to Jobber Agreement.  Paragraph 3a of the Jobber Agreement

18  provides that Sherwin-Williams "shall maintain an adequate stock of Products to service the

19  needs of [Weco]."  See id. ¶ 3a.  Weco reads this provision to prohibit Sherwin-Williams from

20  discontinuing the "Western" product line.  Sherwin-Williams contends the parties did not intend

21  Paragraph 3a to preclude Sherwin-Williams from discontinuing one product and replacing it with

22  another.[12]  However, even construing Paragraph 3a in the light most favorable to Weco, it is

23

24        [12] Sherwin-Williams also contends its decided to discontinue the "Western" line in order
     to comply with government clean air regulations.  Under Ohio law, "[w]here performance of a
25   contractual promise is rendered impossible by the law, nonperformance is excused."  Toledo
     Police Patrolmen's Assn., Local 10, IUPA v. Toledo, 94 Ohio App.3d 734, 739, 641 N.E.2d 799,
26   802 (Ohio App. 1994).  However, there is no evidence that the "Western" paint line violated any
     specific regulations, only that Sherwin-Williams discontinued the "Western" line to replace it
27   "with higher quality paint lines, which were also more compliant with increasingly stringent

28                                                     15

1  undisputed that after Sherwin-Williams announced it would discontinue the "Western" line,

2  Weco was able to place a large order for that paint so it could continue to meet its customers'

3  demands.  See AMF No. 29; PRUMF No. 21; Sorensen Decl. ¶¶ 12, 13; Sorensen Depo. 187:24-

4  188:8; Turner Decl. ¶¶ 9-10.  Moreover, Weco itself argues that Sherwin-Williams reinstated the

5  "discontinued" paint.[12]  See AMF No. 54; Sorensen Decl. ¶ 23.  Weco cannot have it both ways.

6  The undisputed facts do not suggest that Sherwin-Williams failed to "maintain an adequate stock

7  of Products to service the needs of [Weco]."  See FAC, Ex. A., ¶ 3a.  Therefore, a reasonable

8  factfinder could not find that Sherwin-Williams breached the Jobber Agreement by its

9  announcement that it would discontinue the "Western" product line.

10          Weco also alleges Sherwin-Williams breached the Jobber Agreement by refusing to

11  repurchase or accept the return of Weco's unused product.  Weco contends Sherwin-Williams

12  terminated the Jobber Agreement by entering into direct competition with Weco.  The Jobber

13  Agreement provides:

14          In the event of termination of this Agreement by [Weco] for any reason . . .[Sherwin-
        Williams] shall have the right, but not the obligation, to repurchase [Weco]'s inventory of
15      unopened and salable packages or cans of Products . . .

16  Id. ¶ 5d.

17          In the event of termination of this Agreement by [Sherwin-Williams] for any reason other
        than those stated in subsection (i) or (ii) paragraph (d) above, [Weco] may return for a
18      credit all unopened and salable packages of Products except those Products that are
        deemed unsalable by SW in its sole discretion . . .
19
20  Id., ¶ 5e.  With respect to termination, the Jobber Agreement provides, "[i]f this Agreement is

21  breached by [Sherwin-Williams] or [Weco], the non-breaching party may terminate this

22  Agreement immediately by sending written notice to the breaching party."  FAC. Ex. A, ¶ 5b.

23  Reading Paragraphs 5b and 5e together, the plain language provides that termination in the event

24  ────────────────

25  limitations on Volatile Organic Compounds, or VOC's."  Latunski Decl. ¶ 7.  Thus, there is no
    evidence that it was "impossible" to maintain an adequate stock of the "Western" products to
    service Weco's needs.

26          [12] However, it is undisputed that Sherwin-Williams "eventually" discontinued the
27  "Western" line.  See UMF No. 44; PRUMF No. 44.

28                                              16

of a breach requires written notice by the non-breaching party, and that Weco is only entitled to

return products where the agreement is terminated by Sherwin-Williams.  Here, there is no

evidence of a written notice of termination from either party that would trigger the repurchase

provisions in Paragraphs 5d and 5e.  The Court therefore finds that Sherwin-Williams' alleged

refusal to repurchase or accept the return of Weco's inventory cannot form the basis for a breach

of contract claim.

Because there is no genuine issue of material fact as to whether Sherwin-Williams

breached the terms of the Jobber Agreement, the Court will grant summary judgment on the Fifth

Cause of Action.


F.      Breach of the Implied Covenant of Good Faith and Fair Dealing

Weco alleges Sherwin-Williams breached the implied covenant of good faith and fair

dealing by discontinuing the "Western" paint line, contacting Weco's customers directly, offering

to sell "Western" paint to those customers directly, and then later reversing its decision to

discontinue the Western paint line.  Weco argues that many aspects of the business relationship

between the parties were understood from the parties' history and implied in the Jobber

Agreement, including the understanding that Sherwin-Williams would not compete directly with

Weco, its jobber.  Sherwin-Williams contends Weco cannot prove a breach of the implied

covenant of good faith and fair dealing for the same reasons it cannot prove breach of contract.

Sherwin-Williams further contends that selling to end users did not breach the implied covenant

because Paragraph 4b of the Jobber Agreement expressly reserved to it the right to sell to end

users.  Finally, Sherwin-Williams maintains the allegation that it reversed its decision to

discontinue the Western paint line is factually incorrect.[13]

---

[13] In light of the parties' briefs, the court assumes that under Ohio law summary
judgment based on an alleged breach of a contract's express terms does not automatically require
dismissal of a breach of contract claim premised on the implied covenant of good faith and fair
dealing.  In the event Ohio law is to the contrary, the court will give leave to file a supplemental
dispositive motion.

1   Under Ohio law, a contract "has an implied covenant of good faith and fair dealing that

2   requires not only honesty but also reasonableness in the enforcement of the contract." Littlejohn

3   v. Parrish, 163 Ohio App.3d 456, 463 839 N.E.2d 49, 54 (Ohio App. 2005).

4      As stated by the Restatement Second of Contracts, 'Good faith performance or
       enforcement of a contract emphasizes faithfulness to an agreed common purpose and
5      consistency with the justified expectations of the other party.'  It also states that bad faith
       may consist of inaction, or may be the 'abuse of power to specify terms, or interference
6      with or failure to cooperate in the other party's performance.'

7   Id.  "Good faith is a compact reference to an implied undertaking not to take opportunistic

8   advantage in a way that could have not been contemplated at the time of drafting, and which

9   therefore was not resolved explicitly by the parties." Ed Schory & Sons, Inc. v. Soc. Natl. Bank,

10  75 Ohio St.3d 433, 443-44, 662 N.E.2d 1074 (Ohio 1996)).  Therefore, the Court finds the

11  Jobber Agreement contains an implied duty for the parties to act in good faith and deal

12  reasonably with each other.

13      In Ohio, breach of the implied covenant of good faith and fair dealing is not a separate

14  tort, but rather is analyzed as a breach of contract claim.  In other words, "a party can be found to

15  have breached its contract if it fails to act in good faith." Littlejohn, 163 Ohio App. at 463, 839

16  N.E.2d at 54.  There is a genuine issue of material fact as to whether Sherwin-Williams acted in

17  bad faith.  Viewing the evidence in the light most favorable to Weco, the non-moving party, a

18  reasonable factfinder could determine that Sherwin-Williams took advantage of Weco, or

19  interfered with Weco's performance of the Jobber Agreement in a way that could not have been

20  contemplated at the time of drafting, by selling directly to Weco's customers.[14]  Further, as

21

22      [14] To the extent Sherwin-Williams seeks to enforce the limitation of remedies clause with
    respect to Weco's claim for breach of the implied covenant of good faith and fair dealing, the
23  Court finds that the clause is unconscionable under Ohio law.  "Limitation-of-liability clauses are
    viewed critically, but may be freely bargained for in Ohio and will be enforced 'absent important
24  public policy concerns, unconscionability, or vague and ambiguous terms.'" Doe v.
    SexSearch.com, 551 F.3d 412, 419 (6th Cir. 2008).  The Supreme Court of Ohio has held that
25  "[u]nconscionability has generally been recognized to include an absence of meaningful choice
    on the part of one of the parties together with contract terms which are unreasonably favorable to
26  the other party." Lake Ridge Academy v. Carney, 66 Ohio St. 3d 376, 383 (1993).  Here, the
    limitation of liability clause is unreasonably favorable to Sherwin-Williams because it gives
27  Weco no recourse for any wrongful act against it, related to the Jobber Agreement or not, and

28                                                      18

discussed above, there is also a genuine issue of material fact as to whether Weco used "best efforts" to perform its contractual obligations. Therefore, the Court will deny summary judgment as to the Sixth Cause of Action.

First Amended Cross-Complaint

    A.    Breach of Written Contract

    To prove a claim for breach of contract under Ohio law, a party must show: "(1) that a binding contract or agreement exists, (2) that the asserting party performed their contractual obligations, (3) that the party against whom the claim is asserted failed to fulfill its contractual obligations without legal excuse, and (4) that the asserting party suffered damages as a result. See Ireton v. JTD Realty Invests., L.L.C., 162 Ohio Misc.2d at 16, 944 N.E.2d at 1250. In the FACC, Sherwin-Williams asserts a breach of contract counterclaim against Weco for failure to pay for paint products delivered.[15] See FACC ¶¶ 4-9. Sherwin-Williams also contends Weco breached the provision of the Jobber Agreement requiring Weco to use "best efforts" to market Sherwin-Williams products. It is undisputed that Weco ordered and received $135,083.27 worth of paint from Sherwin-Williams in January and/or February 2007. Weco does not dispute it has refused to pay for that paint. "When the facts presented in a case are undisputed, whether they constitute a performance or a breach of the contract, is a question of law for the court." Luntz v. Stern, 135 Ohio St. 225, 247 (Ohio 1939). However, because the Court finds there is a genuine factual dispute as to whether Weco used "best efforts" and whether Sherwin-Williams breached

whether intentional or not. See FAC, Ex. A ¶ 6b. Weco also contends that the Jobber Agreement was not negotiated, and that after twenty-seven years of business, Weco was faced with the decision between signing the agreement or risking the loss of its business relationship with Sherwin-Williams. See Sorensen Decl. ¶ 11. For these reasons, the Court finds that the limitation of remedies clause is unenforceable.

    [15] The FACC also asserts counterclaims for "Goods Sold and Delivered" and "Account Stated." FACC ¶¶ 10-15. These causes of action are premised on the same facts as the breach of contract counterclaim and also seek payment of the $135,083.27 allegedly due and owing. Sherwin-Williams makes no argument with respect to its counterclaims for misappropriation of trade secrets or unfair competition.

the implied covenant of good faith and fair dealing, the Court will deny summary judgment on the FACC.

**CONCLUSION AND ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1.      Sherwin-Williams' Motions for Summary Judgment, or, in the alternative, Summary Adjudication of Issues are GRANTED IN PART and DENIED IN PART.

2.      Summary judgment is GRANTED as to the First, Second, Third, Fourth, and Fifth Causes of Action.

3.      Summary judgment is DENIED as to the Sixth Cause of Action.

4.      Summary judgment on Sherwin-Williams' First Amended Cross-Complaint is DENIED.

IT IS SO ORDERED.

Dated:   May 25, 2012                    _____

                                         CHIEF UNITED STATES DISTRICT JUDGE